UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**Electronically Filed**

| | | |
|---|---|---|
| DANNY WALLACE | ) | |
| | ) | Case No.   `3-13-cv-31-H,` |
| PLAINTIFF, | ) | |
| | ) | COMPLAINT |
| v. | ) | **(Jury Demand Endorsed Hereon)** |
| | ) | |
| MANLEY DEAS & KOCHALSKI, LLC | ) | |
| 1400 GOODALE BOULVARD | ) | |
| SUITE 200 | ) | |
| GRANDVIEW HEIGHTS, OHIO 43212 | ) | |
| | ) | |
| SERVE:      CSC-LAWYER'S | ) | |
|             INCORPORATING SERVICE | ) | |
|             COMPANY | ) | |
|             Registered Agent | ) | |
|             421 W. MAIN STREET | ) | |
|             FRANKFORTY, KY  40601 | ) | |
| | ) | |
|             DEFENDANT. | ) | |

## I.   Introduction

1.      This case seeks relief for Defendant's violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (hereinafter "FDCPA").  These violations relate to a wrongful foreclosure matter filed in the Jefferson (Kentucky) Circuit Court *Cenlar FSB, Central Loan Administration & Reporting v. Dan Wallace,* Jefferson Circuit Court, Division Two (2), Case Number 112-CI-400006.

## II.   Jurisdiction

2.      Jurisdiction arises under 15 U.S.C. § 1692k(d), 28 U.S.C. §§ 1331, 1337(a).

## III.   Parties

3.      Plaintiff Danny Wallace ("Mr. Wallace" or "Plaintiff") is an individual residing in

Jefferson County, Kentucky.  Plaintiff is a consumer under 15 U.S.C. § 1692a(3).

4.      Defendant Manley Deas & Kochalski LLC ("Manley Deas" or "Defendant") is an Ohio-based professional limited liability company, offering legal services, with its principal place of business in Grandview Heights, Ohio.  Manley Deas regularly attempts to collect debts alleged to be due another and is a debt collector as defined by 15 U.S.C. § 1692a(6).

### IV. Facts

5.      On May 21, 2007, Plaintiff obtained a residential mortgage loan from Century Lending Company ("Century Lending") in order to purchase his home in Jefferson County, Kentucky.  He signed a promissory note in the amount of $83,500.00 payable to Century Lending.  The loan was a debt under 15 U.S.C. § 1692a(5).

6.      The loan was secured by a mortgage on Plaintiff's home.

7.      At some point, Century Lending assigned, sold, or otherwise transferred the mortgage to Taylor Bean & Whitaker Mortgage Corp. ("Taylor Bean"), a mortgage company that had been raided by the federal government in August 2009.  Taylor Bean has entered a Chapter 11 bankruptcy action in the U.S. Bankruptcy Court located in Jacksonville, Florida. Taylor Bean is still an active entity.

8.      Because Taylor Bean was embroiled in a Chapter 11 bankruptcy action, it required the bankruptcy Trustee's permission to assign, sell or otherwise transfer Plaintiff's mortgage. Nevertheless, it appears Taylor Bean skipped that step and assigned, sold or otherwise transferred the mortgage to Cenlar, FSB, Central Loan Administration & Reporting ("Cenlar").

9.      At some point, Cenlar may have assigned, sold or otherwise transferred the mortgage to Bayview Loan Servicing, LLC, ("Bayview"), a Florida-based mortgage servicer.

10.     When Mr. Wallace closed on his loan, he paid an extra fee of $200.00 so that he would avoid escrow and pay his own property taxes and insurance on his home.

11.     When the mortgage was assigned to Taylor Bean, it engaged in an industry-wide, fraudulent practice known as force-placed insurance.[1]

12.     At all relevant times, Plaintiff maintained his own homeowner's insurance policy on his home.

13.     Force-placed insurance is a type of hazard insurance that is costly, does not protect the homeowner's interest, and is an additional cost that unlawfully enriches banks and their affiliates.

14.     Force-placed insurance is added to the homeowner's mortgage payment, and, in this case, was totally unnecessary as Plaintiff maintained a policy of insurance that was in full force and effect.  Plaintiff's homeowner's insurance never lapsed.

15.     Taylor, Bean demanded a higher mortgage payment from Plaintiff, beginning July 1, 2009, in the amount of $781.72, representing an immediate increase in Plaintiff's mortgage by $267.60. The original payment, without escrow, and per agreement of the parties, based on long-term course of dealings, was $514.12 per month.

16.     With no just cause, Taylor, Bean put force-placed insurance on Plaintiff's home and then demanded payment for it. Plaintiff showed Taylor, Bean that there was no lapse in coverage when Taylor, Bean attached force-placed insurance on his property, and then billed him for it.

17.     Taylor, Bean promised Plaintiff if he showed proof that there was no lapse in coverage of his homeowner's policy that Taylor, Bean would remove the force-placed insurance and credit to him any charges that they placed against him in a forced-escrow account created when the force-

---

1   Exhibit A – "Hazard Insurance With Its Own Perils," Gretchen Morgenson, *The New York Times,* January 21, 2012.

placed insurance was initially forced upon him. Cenlar also promised same.

18.    Mr. Wallace sent proof of no lapse in insurance to Taylor, Bean by fax and/or mail. Taylor, Bean refused to remove the force-placed insurance.

19.    Mr. Wallace sent proof of no lapse in insurance to Cenlar by fax and/or mail. Cenlar refused to remove the force-placed insurance.

20.    Neither Taylor, Bean nor Cenlar made good on its promises. Said promises were, in fact, false.

21.    Mr. Wallace – by mistake – made one payment covering principal, interest ***and*** force-placed insurance, in the amount of $781.72.  All subsequent monthly payments were for the original sum of $514.12.

22.    At all relevant times, the first monthly payment of $514.12 was rejected by Taylor, Bean, stating that the house payment was now $781.72, and no amount that was less than the new demand which included force-placed insurance, would be accepted.

23.    Plaintiff then made two additional payments in the amount of $514.12 to Taylor, Bean and said payments – both sent in on September 22, 2009 were accepted by Taylor, Bean.

24.    On or about December 1, 2009, Mr. Wallace made two additional monthly mortgage payments in the amount of $514.12 to either Taylor, Bean or to Cenlar, and both were accepted by the servicer.

25.    Subsequent to December 1, 2009, Plaintiff made continuous monthly mortgage payments in the amount of $514.12 to either Taylor, Bean or to Cenlar, and such payments were accepted by the servicer.

26.    When Plaintiff received the end-of-the-year payment report for 2009, it showed a negative sum of $917.05, left over from the $1,045.63. This was the first indication to Mr.

Wallace that the force-placed insurance problem *had not been corrected, even though Taylor, Bean and then Cenlar promised that it would be fixed.*

27.     Taylor, Bean, and then Cenlar, applied unlawfully the principal and interest reflected in Plaintiff's regular monthly payment of $514.12 to a forced-escrow account, and not to principal and interest as it should have been applied. We know this because the unlawful escrow account should have shown a sum of $778.03, giving a credit of $267.60 against the unlawful forced-escrow account of $1,045.63.

28.     Cenlar issued to Mr. Wallace a 2009 Form 1098 indicating that a regular monthly mortgage payment, consisting of principal and interest, in the amount of $514.12 was credited unlawfully to a forced-escrow account created by the servicer to put force-placed insurance on Plaintiff's home when he had already shown the servicer at least three (3) times that he held a homeowner's insurance policy, with coverage never lapsing.

29.     Plaintiff has a good faith belief from all the facts and circumstances that Taylor, Bean – under federal fraud investigation – saw an opportunity to make large profits off of its borrowers by force-placing high-cost and unnecessary insurance policies upon homeowners, including Plaintiff, before the federal government raided Taylor, Bean's operations – and before Taylor, Bean entered Chapter 11 bankruptcy.

30.     Plaintiff has a good faith belief from all the facts and circumstances that Cenlar, saw an opportunity to make large profits off of its borrowers by continuing the fraudulent practice of force-placing high-cost and unnecessary insurance policies on homeowners' properties, including Plaintiff's home.

31.     Under the payment arrangement with Cenlar, Mr. Wallace paid his original mortgage payment of $514.12 per month, and Cenlar accepted same.

32.     On June 1, 2011, Cenlar changed its position and, without notice, jacked up the mortgage payment from $514.12 to $827.56. This jump in the mortgage payment was created when Cenlar paid the 2010 property tax bill on behalf of Plaintiff, even though it was Plaintiff's responsibility to pay the property tax himself. In 2010, Mr. Wallace had to wait until spring 2011 to pay his 2010 property tax bill. When he tendered his property tax payment, he learned Cenlar had paid the property taxes in his stead.

33.     The 2010 property tax bill in question was the first time Mr. Wallace was ever late in paying his property tax bill for about 36 years.

34.     Cenlar informed Mr. Wallace that if he paid Cenlar the $1,701.61, representing the 2010 property tax bill, including interest and penalties, that Cenlar would adjust the mortgage payment and eradicate the forced-escrow account which Mr. Wallace was fighting against for about two-and-one-half years.

35.     On or about June 27, 2011, Plaintiff tendered to Cenlar and Cenlar accepted payment of the $1,701.61, representing reimbursement to Cenlar for the property tax, penalties, and interest Cenlar had advanced on behalf of Plaintiff.

36.     Cenlar refused to honor its promise to Plaintiff and refused to remove the forced-escrow account, demanding instead a double sum for escrow, claiming Plaintiff was short on his escrow obligations, said escrow being unlawful, on account of Cenlar claiming – unlawfully – that Mr. Wallace was required to make up shortfalls for failing to make escrow payments in 2009, 2010 and now 2011.

37.     On July 7, 2011, Mr. Wallace made a regular monthly payment of $514.12 and Cenlar accepted same, applying where Cenlar saw fit, instead of applying the payment to the principal and interest.

38.     On July 22, 2011, Cenlar sent a letter to Mr. Wallace demanding that he pay two additional payments on his mortgage.

39.     On July 28, 2011, Plaintiff tendered two payments of $514.12 each to Cenlar.

40.     On August 22, 2011, Cenlar sent a letter to Plaintiff demanding again two regular monthly payments, claiming that Plaintiff was still behind in his mortgage payments to Cenlar. This is significant because it shows that Cenlar refused to correct its mistakes and honor its promise to remove Plaintiff's account from forced-escrow obligations.

41.     On or about August 22, 2011, Mr. Wallace contacted Cenlar by telephone, asking what happened to his payment of $1,701.63, representing the 2010 property tax obligation and what happened to the $1,028.24 – representing two payments of $514.12.  Cenlar responded that it had no answers for Plaintiff and that Cenlar had to put in a request to research the issues Plaintiff presented.

42.     At some point, Cenlar demanded Plaintiff to stop making his regular monthly payments of $514.12 because that sum was no longer Plaintiff's house payment, even though Cenlar had previously promised to eradicated the forced-escrow obligation.

43.     Plaintiff waited for Cenlar's response to his request to research where his payments of $1,701.63 and $1,028.24 went, but Cenlar never responded.

44.     Mr. Wallace continued to wait for Cenlar's response; Cenlar sent on October 6, 2011 a statement demanding $4,163.80 as payment to cover arrearages, when arrearages could only be two payments of $514.12 each and a current payment, representing the October 2011 payment of $514.12.

45.     Mr. Wallace still continued to wait for Cenlar's response; Cenlar sent on November 16, 2011, a statement demanding payment of $5,017.07, representing more than the arrearages that

had accumulated at the rate of $514.12 per month. In fact, it appears that an additional $853.27 demanded was to cover the unlawful forced-escrow account.

46.     Mr. Wallace decided that he could no longer continue "working with" Cenlar when Cenlar continued to breach its promises to him and continued to demand an unlawful forced-escrow obligation.

47.     At all relevant times, only an unlawful, forced-escrow obligation would create an amount due of $4,163.80 on October 6, 2011 and $5,017.07 on November 16, 2011.  Plaintiff's credit score was 800 or higher until the forced-placed insurance scheme was implemented against Plaintiff and the subsequent wrongful foreclosure action was filed..

48.     Mr. Wallace sought to refinance his mortgage, but no lender would grant refinancing because the foreclosure crisis and mortgage underwriting guidelines have made it exceedingly difficult for the average American like Mr. Wallace to obtain new financing. This is through no fault of Mr. Wallace; it is the industry and its very strict underwriting guidelines that make it near impossible.

49.     At some point, Mr. Wallace again attempted to discuss the mortgage with Cenlar, but Cenlar automatically transferred the call, by the account number, to Bayview Loan Servicing, LLC, ("Bayview"), a Florida-based mortgage servicer who was apparently assigned Plaintiff's account for a loan modification or other work-out options.  This was news to Plaintiff.

50.     The sole reason Plaintiff's account appeared to be in arrears was through the affirmative acts of Century Lending and Taylor, Bean and Cenlar – and, late in this sorrowful history, Bayview.

51.     Bayview pressured Plaintiff to sign a new agreement that would give Bayview exorbitant fees representing so-called foreclosure fees and other fees.  If a proper accounting had been

applied to Mr. Wallace's account, there would not be any arrears at the time the problem escalated.

52.     Bayview then engaged in strong-arm tactics, insisting on loan modification processes that failed to inform Mr. Wallace of the new monthly loan obligation as well as a promise that the forced-escrow obligation would be corrected.

53.     Mr. Wallace stated that he could pay the sum required the very next business day so long as Bayview could provide, in writing, a payment which showed what amount would be applied to principal each month and what amount would be applied to interest each month – along with a promise in writing that Mr. Wallace's account would be serviced as a non-escrow account.

54.     Bayview failed to provide any information about the loan modification and/or reformation verbally or in writing, giving Plaintiff no concrete information about the cost of the loan, which is a violation of the state predatory lending laws and amounts to fraud.

55.     While Mr. Wallace was in contact with Bayview, Bayview and/or Cenlar referred the matter to a foreclosure attorney who filed a foreclosure action without conducting an investigation into the facts surrounding the alleged debt.

56.     At all relevant times, Plaintiff has never had a contract with Bayview, but Bayview took upon itself the role of mortgage servicer at a fragile point in time – when Cenlar's bad acts, on top of Taylor, Bean's bad acts and Century Lending's bad acts – created a problem for Plaintiff when no such problem should exist.

57.     Plaintiff has not defaulted on his mortgage loan.  All acts that have caused the alleged debt are the sole fault of Taylor, Bean, then Cenlar, then Bayview.

58.     On January 4, 2011, Defendant filed a foreclosure action in Jefferson County, Kentucky, on behalf of Cenlar.  Defendant failed to investigate the debt that Cenlar claimed was allegedly

owed by Plaintiff.  The statements in the foreclosure Complaint are false, deceptive and misleading and a violation of the FDCPA.

59.     On January 13, 2011, the Jefferson County Sheriff left a notice[2] on Plaintiff's property that stated legal process was awaiting him.  On January 13, 2011, Plaintiff had not yet received notice of the false and misleading and deceptive statements Defendant wrongfully asserted in the Complaint.  This Complaint is timely, having been filed within one year of the Plaintiff's receiving the false foreclosure Complaint filed by Defendant in Jefferson (Kentucky) Circuit Court.

60.     Defendant failed to investigate the alleged debt at issue in the foreclosure action and refused to discover the problem and assist its client in removing forced-place insurance retroactively and providing proper credits to Plaintiff's mortgage loan account.

61.     Plaintiff filed a timely Answer, Defenses, and Counterclaims against Century Lending; Taylor, Bean; Cenlar and Bayview.  The Court documents set forth the wrongdoing of Century Lending; Taylor, Bean; Cenlar and Bayview, but Defendant still refused to investigate the problem, or advise Cenlar to cure the problem.  Instead, Defendant stood on its false, misleading and deceptive statements and took further steps, and made further false, misleading and deceptive statements – all designed to unlawfully collect a debt that, in fact, does not exist.

62.     On February 14, 2012, Defendant filed an Answer to Mr. Wallace's Counterclaims, said Answer amounting to false and misleading and deceptive statements made in a wrongful attempt to collect on a debt that does not, in fact, exist.

63.     Defendant refused to exercise due diligence and refused to investigate Plaintiff's

2   Exhibit B – Sheriff's notice that legal process was awaiting Plaintiff, but not yet served to Plaintiff.  Therefore, the false, misleading and deceptive statements contained in Defendant's wrongful foreclosure action had not yet been published to Plaintiff.  The false, misleading and deceptive statements were first published to Plaintiff after January 13, 2012.

assertions that the mortgage indebtedness was not in arrears, but caused by Taylor, Bean, then Cenlar, then Bayview in a fraudulent attempt to enrich themselves unjustly by inflicting false debt on borrowers like Plaintiff.  Defendant has no right to rely on its client's assertions of false debt when attempting to collect a debt from Plaintiff.

64.     Because Defendant refused to listen to Plaintiff, Plaintiff has been unable to resolve the problem.

65.     During the entire ordeal, Plaintiff has been forced to live in fear under the continued threat that his home is going to be foreclosed unjustly – and sold at the courthouse steps when no such action should take place.

66.     Plaintiff has been made to live under the continued threat of eviction when Defendant should have investigated the relevant documents and seen that the debt Defendant claims to be owed does not exist.

67.     During the process, Defendant did not act in good faith, and in fact, acted maliciously, or in gross disregard to the rights of Plaintiff and of the effect of its actions on Plaintiff.  Defendant has had the audacity to continue the foreclosure action, based on false statements and misleading and deceptive acts, and continues to seek foreclosure when the problem presented was created solely by Defendant's client – Cenlar – and both Cenlar's predecessors and successor in interest. Defendant pays no mind to how abusive and how malicious it has acted toward Plaintiff – or how much Defendant exercised a gross disregard to the rights of Plaintiff.  This is yet another example of Defendant's utter callousness in regards to its false, misleading and deceptive practices toward Plaintiff.

## COUNT I

68.    Plaintiff re-alleges and incorporate by reference the allegations of paragraphs 1 – 67 as if fully rewritten herein.

69.    Defendant's actions, as described above, constitute conduct the natural consequence of which was to harass, oppress, or abuse Plaintiff in connection with the collection of a debt, a debt that did not, in fact, exist.

70.    As a result, Defendant violated 15 U.S.C. § 1692d, and entitles Plaintiff to damages under 15 U.S.C. § 1692k.

## COUNT II

71.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 – 70 as if fully rewritten herein.

72.    Defendant's actions, as described above, constitute unfair or unconscionable means to collect or attempt to collect any debt, a debt that did not, in fact, exist.

73.    As a result, Defendant violated 15 U.S.C. § 1692f, and entitles Plaintiff to damages under 15 U.S.C. § 1692k.

## COUNT III

74.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 – 73 as if fully rewritten herein.

75.    Defendant's actions, as described above, constitute the use of false, deceptive, or misleading representations or means in connection with the collection of any debt, a debt that did not, in fact, exist.

76.    As a result, Defendant violated 15 U.S.C. § 1692e, and entitles Plaintiff to damages under 15 U.S.C. § 1692k.

## COUNT IV

77.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 – 76 as if fully rewritten herein.

78.    Defendant failed to provide Plaintiffs with the notice required by 15 U.S.C. § 1692g, entitling Plaintiff to damages under 15 U.S.C. § 1692k.

## COUNT V

79.    Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 – 48 as if fully rewritten herein.

80.    Defendant knew, or should have known that its conduct, as described above, would result in serious emotional distress to Plaintiff and that its conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community.

81.    Defendant's actions caused Plaintiff – who acted in good faith to alert Talyor, Bean, then Cenlar, then Bayview of the problem caused by the wrongful, force-placed insurance – psychological injury and serious mental anguish of a nature no reasonable person could be expected to endure.

WHEREFORE, Plaintiff requests that the Court order the following relief in his favor and against Defendant:

   a.    actual and statutory damages pursuant to 15 U.S.C. § 1692k(2)(B);

   b.    punitive damages;

   c.    an award of attorney's fees, litigation expenses and costs pursuant to 15 U.S.C. § 1692k(3) and/or IC § 24-5-0.5-0.1 *et seq*; and

   e.    such other and further relief as appropriate.

Respectfully Submitted,

/s/Ninamary Buba Maginnis
Ninamary Buba Maginnis, Esq. (Kentucky 87432)
Maginnis Law Office
2212 Bradford Drive, Suite 102
Louisville, Kentucky  40218
Telephone:     502-458-5875
Facsimile:      502-458-4790
email:  ninamary@maginnislawoffice.com

*Counsel for Plaintiff, Dan Wallace*

## JURY DEMAND

Plaintiffs request a trial by jury on all claims.

/s/ Ninamary Buba Maginnis
Ninamary Buba Maginnis (Kentucky 87432)